1

1     IN THE UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3    UNITED STATES OF AMERICA   :

4                               :

5       VS                      :   NO. 3:15-CR-108

6                               :

7    DARIAN TENSLEY,            :

8    Defendant                  :

9


10       BEFORE:      HONORABLE JAMES M. MUNLEY
                     UNITED STATES DISTRICT JUDGE
11
         PLACE:       SCRANTON, PENNSYLVANIA
12
         PROCEEDINGS: GUILTY PLEA/SENTENCING
13
         DATE:        WEDNESDAY, JUNE 15, 2016
14

15
     APPEARANCES:
16
     For the Government:     TODD K. HINKLEY, ESQ.
17                           Assistant U.S. Attorney
                             William J. Nealon Federal Building
18                           Suite 311
                             Scranton, PA  18501
19

20
     For the Defendant:      INGRID S. CRONIN, ESQ.
21                           Federal Public Defender
                             201 Lackawanna Avenue
22                           Suite 317
                             Scranton, PA  18503
23

24

25

2

1                         WITNESS INDEX

2    FOR THE GOVERNMENT                DIRECT        CROSS

3    JAMES SIEDEL                        20           25

4

5

6

7    FOR THE GOVERNMENT                IDENTIFIED    ADMITTED

8    Exhibit No. 1                        21           22

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1      THE COURT:  Mr. Hinkley and Ms. Cronin.

2      MR. HINKLEY:  Good morning, Your Honor.

3      May I call the case, Your Honor?

4      THE COURT:  Would you please?

5      MR. HINKLEY:  This is the United States of America

6  versus Darian Tensley.  It is docketed to 3:15-CR-108.

7      This is the date, time and place set for a guilty

8  plea and immediate sentencing of Mr. Tensley.

9      The record should reflect, Your Honor, that he is

10  before the Court this morning.  He is represented by counsel,

11  Attorney Ingrid Cronin.  I'm here on behalf of the United

12  States.

13      We note that there is no plea agreement.  The

14  Defendant has agreed to plead guilty to the indictment that's

15  been filed, as I will modify on the record, and I can get into

16  that right now if the Court wishes.

17      I would note that the indictment filed returned by

18  the grand jury charges him with a violation of Title 18, United

19  States Code, Section 111(a) and (b), and that is assault of a

20  federal officer.

21      He has agreed to plead guilty to a violation of Title

22  18, United States Code, Section 111(a), which would be a lesser

23  included offense and would not include Subsection B.

24      That would mean that he is pleading guilty to having

25  physically contacted during the assault which results in a

**4**

1  penalty of up to eight years.

2          THE COURT:  Good morning, Mr. Tensley.

3          MR. TENSLEY:  How are you doing?

4          THE COURT:  Mr. Tensley, I have been informed that

5  you wish to enter a plea of guilty to the charges, is that

6  correct?

7          MR. TENSLEY:  Yes.

8          THE COURT:  Mr. Tensley, before accepting a plea, it

9  is necessary for the Judge to ask a lot of questions.  I

10 apologize for that, but it is necessary to make sure you know

11 what you are giving up when you plead guilty, and that I am

12 confident that it is a voluntary decision on your part.  So I

13 apologize for all the questions, but they are necessary.

14         Darian, I believe you are 38 years old, is that

15 right?

16         MR. TENSLEY:  Yes.

17         THE COURT:  The first thing we should do is swear you

18 in.

19         Would you raise your right hand?

20 DARIAN TENSLEY, having been duly sworn or affirmed according to

21 law, testified as follows:

22         THE COURT:  So now you are under oath, and it is

23 imperative that you answer the questions truthfully, otherwise

24 you could be charged with perjury or false statements.  So bear

25 with me.

1          You did say you were 38?

2          MR. TENSLEY:  Yes.

3          THE COURT:  And where are you from?

4          MR. TENSLEY:  Clearwater, Florida.

5          THE COURT:  How far did you go in school?

6          MR. TENSLEY:  Ninth grade.

7          THE COURT:  And you read and write the English

8  language, correct?

9          MR. TENSLEY:  Yes.

10          THE COURT:  Have you had any drugs or alcohol in the

11  last 24 hours?

12          MR. TENSLEY:  No, nothing but my allergy medication.

13          THE COURT:  Have you ever been treated for a mental

14  condition?

15          MR. TENSLEY:  No.

16          THE COURT:  And Ms. Cronin is representing you.

17          Are you satisfied with her?

18          MR. TENSLEY:  I have been treated for mental since

19  2003.

20          THE COURT:  I don't know what you said.

21          MR. TENSLEY:  I was treated for psychological.

22          MR. HINKLEY:  He's being treated for psychological

23  issues, Your Honor.  He is, yes.

24          THE COURT:  Darian, how long ago was that?

25          MR. TENSLEY:  2003.

**6**

1       THE COURT:  Are you taking any medication for that?

2       MR. TENSLEY:  Yes.  I'm taking three medications.

3       THE COURT:  What kind of medications do you take?

4       MR. TENSLEY:  Zoloft, Buspar and Elavil.

5       THE COURT:  Does that affect your ability to

6  understand what I said so far?

7       Have you understood everything I have said so far?

8       MR. TENSLEY:  Yes, but it makes me fade in and out.

9       MR. HINKLEY:  He says he does understand, but it

10 makes him fade in and out.

11      THE COURT:  At any time when we're going through

12 this, if you don't understand what I'm saying, just indicate

13 that to me, okay?

14      MR. TENSLEY:  Okay.

15      THE COURT:  Let gets back to Ms. Cronin.

16      Are you satisfied with her representation with you in

17 this matter?

18      MR. TENSLEY:  At this time I am.

19      THE COURT:  She is standing right next to you.  The

20 only reason she is here is to protect you.

21      So as we go through this, she is standing right next

22 to you.  At any time you want to, just lean over and talk to

23 her.

24      If you want to, just let me know, just wave your

25 hand, and you can step to the back of the courtroom and talk to

1  her privately, if you want that.  Okay?

2              MR. TENSLEY:  Yes.

3              THE COURT:  So I will ask you a number of questions

4  and make statements, and if you don't understand what I'm

5  saying, just indicate that to me, and I will do my best to

6  rephrase or to explain the matter further.  Okay?

7              MR. TENSLEY:  Yes.  Thank you.

8              THE COURT:  Now, it's my responsibility to explain to

9  you your Constitutional Rights and how they are affected by you

10 pleading guilty, and that is what we're doing now.  We are

11 entertaining your plea of guilty to the charge.

12             The first is that you understand that you don't have

13 to plead guilty today.  Do you understand that?

14             MR. TENSLEY:  Yes.

15             THE COURT:  And if you didn't plead guilty, at a time

16 in the immediate future, we would call a number of prospective

17 jurors here to this courtroom.  Okay?

18             MR. TENSLEY:  Yes.

19             THE COURT:  And these people would come from all over

20 Northeastern Pennsylvania, and you and Ms. Cronin would

21 participate in selecting 12 of those people.

22             MR. TENSLEY:  Yes.

23             THE COURT:  They would represent the jury, and they

24 would sit over there in the jury box, and they would hear all

25 the testimony, and at the conclusion of the trial, they would

8

1  render a verdict of guilty or not guilty.

2        Do you understand that?

3        MR. TENSLEY:  Yes.

4        THE COURT:  Now, I can best explain to you the effect

5  of you pleading guilty on your Constitutional Rights.  Okay?

6        MR. TENSELY:  Yes.

7        THE COURT:  So just for illustration purposes, I just

8  want to talk to you about your rights without considering you

9  being guilty or not guilty.

10       These are the rights that you possess.  Okay?

11       MR. TENSLEY:  Okay.

12       THE COURT:  So if we had pursued that course, and you

13  continued to plead not guilty, we would have this trial, and

14  that jury would hear the case.

15       Do you understand that?

16       MR. TENSLEY:  Yes.

17       THE COURT:  And at that trial, you would be presumed

18  innocent of the charges.

19       Do you understand that?

20       MR. TENSLEY:  Yes.

21       THE COURT:  And the Government would have to -- Mr.

22  Hinkley and company, the Government, would have to prove you

23  guilty beyond a reasonable doubt.

24       Do you understand that?

25       MR. TENSLEY:  Yes.

1          THE COURT:  And if you had pursued that course, you

2  would not have to prove you were innocent.

3          In fact, you wouldn't even have an obligation to

4  present any evidence on your behalf.

5          Do you understand that?

6          MR. TENSLEY:  Yes.

7          THE COURT:  And the reason for that is, the burden of

8  proof -- you would have no burden of proof whatsoever.  The

9  burden would always be on the Government, and that burden would

10  be to prove you guilty beyond a reasonable doubt.

11          Do you understand that?

12          MR. TENSLEY:  Yes, I do.

13          THE COURT:  At trial, you would be entitled to be

14  represented by Ms. Cronin, and through her to confront and

15  cross-examine any witness who might appear to testify against

16  you.

17          Do you understand that?

18          MR. TENSLEY:  Yes.

19          THE COURT:  At trial, you would be permitted to

20  testify -- I'm sorry -- to call witnesses to appear and testify

21  on your behalf, if you so desired.

22          Do you understand that?

23          MR. TENSLEY:  Yes.

24          THE COURT:  And do you understand that you could only

25  be convicted; in other words, you could only be found guilty by

1  that jury if the jury unanimously found you guilty of the

2  charges, which means, Darian, all 12 jurors would have to agree

3  on your guilt before you could be found guilty of the charges?

4        Do you understand that?

5        MR. TENSLEY:  Yes.

6        THE COURT:  And at trial, you would have the right to

7  testify, if you choose to do so, but you would also have the

8  right not to testify.  That would be your choice.

9        If you chose not to testify, I would instruct the

10  jury that they could not draw any adverse inference with regard

11  to your failure to testify.

12        Do you understand that?

13        MR. TENSLEY:  Yes.

14        THE COURT:  So these are the principles that I want

15  to talk to you about.

16        You understood everything I said so far, right?

17        MR. TENSLEY:  Yes.

18        THE COURT:  Now, obviously, these rights that I have

19  just explained to you contemplate you pleading not guilty,

20  having a jury trial and let the jury determine your guilt or

21  innocence.

22        Do you understand that?

23        MR. TENSLEY:  Yes.

24        THE COURT:  But the first question that I asked you

25  here this morning was, I have been informed, Mr. Tensley, that

1  you wish to enter a plea of guilty, and you said, yes, Judge, I

2  do, right?

3          MR. TENSLEY:  Yes.

4          THE COURT:  So if you entered a plea of guilty, there

5  won't be any trial, there won't be any jury, and you will have

6  surrendered or waived or given up these Constitutional Rights

7  that I just discussed with you.

8          Do you understand that?

9          MR. TENSLEY:  Yes.

10          THE COURT:  So is it your desire to enter a plea of

11  guilty and to give up these Constitutional Rights?

12          MR. TENSLEY:  Yes.

13          THE COURT:  And you think it's in your best interest

14  to do so?

15          MR. TENSLEY:  Yes.

16          THE COURT:  And if you enter a plea of guilty, and

17  it's accepted by the Court, you won't be able to withdraw your

18  plea if you're unhappy about the sentence I impose.

19          Do you understand that?

20          MR. TENSLEY:  Yes.

21          THE COURT:  Now, Darian, you are charged with the

22  following crime:  Assault on a Federal corrections officer.

23          Do you understand that?

24          MR. TENSLEY:  Yes.

25          THE COURT:  Now I'm going to ask Mr. Hinkley if he

1  would tell you, for the record, what the elements of that

2  offense are.

3        MR. HINKLEY:  Certainly, Your Honor.

4        As I had indicated at the beginning of this

5  proceeding, the Defendant is pleading guilty to the indictment

6  charging him with a violation of Title 18, United States Code,

7  Sections 111(a) and 111(a) only.

8        That's a felony that indicates that he has forcibly

9  assaulted a correctional officer and made contact with the

10  officer during the assault.

11        Now, there are three elements to this crime.  The

12  first is that the Defendant forcibly assaulted James Siedel,

13  the corrections officer in this particular case.  Second, that

14  the Defendant did so while Mr. Siedel was engaged in or on

15  account of his official duties.  Third, that the Defendant made

16  physical contact during the assault.

17        THE COURT:  Those are the three elements.

18        Do you understand those, Darian?

19        MR. TENSLEY:  I understand.

20        THE COURT:  You understand?

21        MR. TENSLEY:  Yes.

22        THE COURT:  Now I'm going to ask Mr. Hinkley if he

23  would put on the record what you did, and then I will come

24  back, and I will ask you, Darian, if you admit that you did

25  these things.  So please listen to Mr. Hinkley.

1          MR. HINKLEY:  Thank you, Your Honor.

2          On August 14th, 2013, around 6:30 in the morning,

3   Officer James Siedel, a correctional officer at the Federal

4   Correction Institute in Schuylkill, was in the food service

5   area when he attempted to conduct a random pat-down search of

6   the Defendant, Darian Tensley, who was an inmate at the

7   institution at that time.

8          While he was performing this pat-down search from

9   behind, Mr. Tensley quickly turned around, and Mr. Siedel then

10  stood up.  At that point, Mr. Tensley punched the correctional

11  officer twice in the face -- once in the face.

12          THE COURT:  Once?

13          MR. HINKLEY:  Once in the face.

14          THE COURT:  Do you understand that?

15          Do you admit that you did the things he says you did?

16          MR. TENSLEY:  Not in that order.

17          THE COURT:  Do you admit or deny that you did the

18  things he says you did?  That's the question.  It's not what

19  order they came in.

20          Do you admit that you did these things?

21          MR. TENSLEY:  Yes.

22          THE COURT:  You do?

23          MR. TENSLEY:  Yes.

24          THE COURT:  Now, the maximum penalty under the

25  statute is?

1    MR. HINKLEY:  It's eight years in prison, Your Honor,

2 a $250,000 fine, up to three years of supervised release which

3 would be served at the conclusion of and in addition to any

4 term of imprisonment, as well as a $100 special assessment.

5    THE COURT:  Do you understand that?

6    MR. TENSLEY:  Yes.

7    THE COURT:  Are you entering this plea according to

8 your own free will?

9    Has anyone forced you or persuaded you to enter a

10 plea of guilty?

11    Are you entering this plea of guilty according to

12 your own free will?

13    Has anyone forced you to plead guilty?

14    MR. TENSLEY:  No.

15    THE COURT:  There has been no plea agreement, is that

16 correct?

17    MR. HINKLEY:  That is correct.

18    The Defendant is pleading guilty open to the

19 indictment as modified by today's proceedings.

20    THE COURT:  Has anyone promised you what the sentence

21 will be in this case?

22    MR. TENSLEY:  No, no promises.

23    THE COURT:  No promises have been made.

24    I just want to talk to you for a moment about the

25 Sentencing Reform Act of 1984.

1        Under that, that act was created, the United States

2   Sentencing Commission, and they issued guidelines for Judges to

3   follow in determining what the sentence will be in a criminal

4   case such as this.

5        Do you understand that?

6        MR. TENSLEY:  Yes.

7        THE COURT:  And have you and Ms. Cronin talked about

8   the sentencing commission guidelines and how they might apply

9   to your case?

10        MR. TENSLEY:  Yes.

11        THE COURT:  And do you understand that the Court --

12   do you understand what these guidelines do is they establish

13   sentencing ranges which are advisory to the Court?

14        They are not mandatory on the Court, but the Court

15   does consult the guidelines and takes the guidelines into

16   account when they are imposing a sentence on anyone.

17        Do you understand that?

18        MR. TENSLEY:  Yes.

19        THE COURT:  Do you understand that after it's been

20   determined what guideline range applies to the case, the Judge

21   has the authority to impose a sentence that is more severe or

22   less severe than the sentence that is suggested by the

23   guidelines?

24        Do you understand that?

25        MR. TENSLEY:  Yes.

1          THE COURT:  And do you understand that if you are
2     sent to prison, a term of supervised release will be imposed
3     after you're released from prison?
4          Do you understand that?
5          MS. CRONIN:  Your Honor, I should tell you that I
6     have explained to my client that sometimes when a person is
7     already serving a sentence that has a term of supervised
8     release attached to the term he's presently serving, that
9     sometimes the Court does not add more supervised release, but
10    rather tells --
11         THE COURT:  That's true.
12         MS. CRONIN:  Your Honor, I believe my client does
13    understand that.
14         THE COURT:  A term of supervised release will be
15    imposed, but it would run, under these circumstances,
16    concurrently with what you are presently serving.
17         Do you understand that?
18         MR. TENSLEY:  Yes.
19         THE COURT:  Do you understand that if you violate
20    your supervised release, the one that you're presently under,
21    you can be returned to prison?
22         Do you understand that?
23         MR. TENSLEY:  Yes.
24         THE COURT:  And do you understand that under some
25    circumstances, you or the Government may have a right to appeal

1  any sentence that I impose in the case?

2          Do you understand that?

3          MR. TENSLEY:  Yes.

4          THE COURT:  Do you understand that parole in the

5  Federal system has been abolished, and if you are sentenced to

6  prison, you will not be released on parole?

7          Do you understand that?

8          MR. TENSLEY:  Yes.

9          THE COURT:  Do you understand that if the sentence is

10  more severe than you expected, you will still be bound by your

11  plea and will have no right to withdraw it?

12          Do you understand that?

13          MR. TENSLEY:  Yes, I understand.

14          THE COURT:  Do you understand that?

15          MR. TENSLEY:  Yes.

16          THE COURT:  Do you understand, Mr. Tensley, that the

17  crime that you are pleading guilty to is a felony, and if it's

18  accepted and adjudicated, it can deprive you of valuable Civil

19  Rights, such as the right to vote, the right to hold public

20  office, the right to serve on a jury, the right to possess any

21  kind of a firearm?

22          Sometimes it can affect immigration statuses, and as

23  a consequence of pleading guilty, it may require you to submit

24  to DNA sampling.

25          Do you understand that?

1          MR. TENSLEY:  Yes.

2          THE COURT:  So we have talked about a number of

3  matters, Darian, over the last half hour.

4          Is there anything that you don't understand?

5          Do you understand everything that I have discussed

6  with you?

7          MR. TENSLEY:  Yes, I understand.

8          THE COURT:  What did you say?

9          MR. TENSLEY:  I understand.

10          THE COURT:  So is it still your intention to plead

11  guilty?

12          MR. TENSLEY:  Yes.

13          THE COURT:  Do you think it's in your best interest

14  to do so?

15          MR. TENSLEY:  Yes.

16          THE COURT:  How do you plead to the charge, guilty or

17  not guilty?

18          MR. TENSLEY:  Not guilty.  Oh, yeah, guilty.

19          THE COURT:  How does he plead?

20          MR. TENSLEY:  Guilty.

21          THE COURT:  Do you understand that you have a right

22  to plead not guilty?

23          Are you telling me you are pleading guilty to the

24  charge?

25          MR. TENSLEY:  Yes, I'm pleading guilty.

1      MS. CRONIN:  Yes.

2      THE COURT:  Now, there's a motion for immediate

3 sentencing.

4      MS. CRONIN:  Yes, Your Honor.

5      MR. HINKLEY:  The Government concurs, Your Honor.

6      THE COURT:  Very good.  We will grant that motion.

7      MR. HINKLEY:  Your Honor, there has been a

8 presentence investigative report prepared by the probation

9 department in anticipation of the guilty plea today, and a copy

10 of that has been provided to the Defendant, his counsel, and

11 Government's counsel.  We have all reviewed that presentence

12 investigative report.

13      We note that there is one objection that has been

14 lodged by the defense in regards to a two-level enhancement

15 found by the probation department, which would be Paragraph No.

16 15 of the presentence investigative report on Page 5.

17      The probation department indicates that there is

18 specific offense characteristics, including Correctional

19 Officer James Siedel sustained lacerations to his lips and

20 elbow.  Two levels are added because Officer Williams (sic)

21 sustained bodily injury in accord with U.S.S.G. Section

22 2A2.4(b)(2).

23      The defense has objection to that two-level

24 enhancement.  That is the only objection I believe there is, so

25 we need to address that at this point.

1     MS. CRONIN:  That is correct, Your Honor.

2     THE COURT:  Do you want to proceed?

3     MR. HINKLEY:  I will do so by calling James Siedel to

4  the witness stand, Your Honor.

5  JAMES SIEDEL, having been duly sworn or affirmed according to

6  law, testified as follows:

7                    DIRECT EXAMINATION

8  BY MR. HINKLEY:

9  Q.   State your name for the record.

10  A.   Jim Leroy Siedel.

11  Q.   Mr. Siedel, how are you employed?

12  A.   I work with the Department of Justice.  I work at FCI

13  Schuylkill.

14  Q.   Sir, are you a corrections officer?

15  A.   Yes.

16  Q.   How long have you held that position?

17  A.   Since '94.

18  Q.   1994?

19  A.   October of '94 is when I first started.

20  Q.   And were you working as a correctional officer on August

21  14th, 2013?

22  A.   Yes, I was.

23  Q.   And were you that morning involved in an incident with

24  Inmate Darian Tensley?

25  A.   Yes, I was.

1  Q.    Is Mr. Tensley in the courtroom here today?

2  A.    Yes, he is.

3  Q.    And could you identify him for the record, please?

4  A.    Yes.  Mr. Tensley is standing right over there, sir.

5           MS. CRONIN:  We will stipulate.

6           MR. HINKLEY:  Just to be clear for the record, Your

7  Honor, he has identified Mr. Tensley, the Defendant, here this

8  morning.

9  BY MR. HINKLEY:

10 Q.    Would you give just a brief description of what happened

11 in this incident?

12 A.    Mr. Tensley was exiting our chow hall area, and at that

13 time, we do random shakedowns of inmates leaving the chow hall

14 to make sure they're not taking anything that they're not

15 supposed to have outside the chow hall.  I did a random

16 shakedown on him.

17        At the time I was going down his lower torso, he had spun

18 and hit me as I was standing up, because when I pat him down,

19 I'm patting him down from the backside.  He had his arms up

20 like this (indicating).  When I went down his lower torso, he

21 spun hitting me.

22        By the time I stood up, he was already facing me, and he

23 just slugged me right in the face.

24 Q.    I show you what's been marked as Government Exhibit No. 1

25 for identification purposes.

1    Describe what that is.

2  A.   It's a picture of the injuries that I received from Inmate

3  Tensley hitting me.

4  Q.   And does it accurately reflect your injuries that day?

5  A.   The physical ones, you could see.

6    I actually had -- my upper lip was busted open, too, the

7  inside, because my lips had actually got jammed into my teeth.

8  Q.   I will ask you some questions in regards to that in a

9  moment.  I will pass this up to the Court.

10        THE COURT:  Do you move for its admission?

11        MR. HINKLEY:  I do, Your Honor.

12        THE COURT:  It's admitted without objection.

13        MS. CRONIN:  No objection.

14    (At this time, Government No. 1 was admitted into

15  evidence.)

16  BY MR. HINKLEY:

17  Q.   So I take it from your testimony that Mr. Tensley punched

18  you in the face?

19  A.   Yes.

20  Q.   What type of injuries did you receive?

21  A.   I received cuts to both my lips, the inside part of them.

22  I was bleeding from my nose, and in the process of the assault,

23  we took Mr. Tensley down somewhere in that area (indicating), I

24  had hurt my elbow from landing on the floor with Tensley.

25  Q.   And these injuries that you received, were they painful?

1 A.    Yes, very much so.

2 Q.    Did you seek medical attention?

3 A.    Yes.  I had initially gone to our hospital area where they

4 had looked at me and did an injury assessment.

5       Then, from there, I went to the outside hospital to the

6 emergency room.

7 Q.    And what type of treatment did you receive at the

8 hospital?

9 A.    The doctors had given me X-rays of my arm, or my elbow

10 area, and they had also reviewed the injuries to my mouth,

11 checked my teeth, to make sure my teeth weren't loose, and also

12 looked at the inside of my lips and everything and made sure I

13 was okay there.

14 Q.    Did you receive any sutures or any stitches?

15 A.    No.  They said that because of it being in the inside of

16 my mouth, they wouldn't give me stitches in my mouth.

17 Q.    So that was that?

18 A.    I didn't get no stitches.

19 Q.    Did you receive any medication?

20 A.    He had told me that I'm going to probably have -- because

21 at the time, I had had a headache -- he said that I will

22 probably have headaches for a couple days, and that I could

23 just take something over the counter, and if it got worse, I

24 could come back into the emergency room.

25       So I just took over-the-counter, like, Tylenol and Motrin

1  for the headaches.

2  Q.   And how long did the headaches last?

3  A.   Roughly, three days.

4  Q.   Did you go back to work after this incident?

5  A.   Yes.  I went back to work the following day.

6  Q.   Did you, as a result of this incident, besides the

7  physical injuries you have already described, were there any

8  other effects?

9  A.   Well, psychologically, it was a little tough trying to get

10  back to work.

11      I had seen through my career of officers that were

12  assaulted, that it seemed like if they didn't come back, it was

13  very hard to come back, and some of them actually resigned and

14  got other jobs, and I pretty much knew I had to go back in the

15  next day.

16      I was even told from my staff, you know, take a couple

17  weeks off, but I didn't want to.  I couldn't move, like, smile

18  and stuff, because my lips were still swollen from the assault,

19  but I knew if I didn't go back, it would be hard.

20      It was very hard psychologically dealing with the issue,

21  too.  You know, I got assaulted in front of the inmates I work

22  with every day, in front of my staff members I work with every

23  day, and so I made it back, but, yes, it was very difficult

24  going back.

25  Q.   So after the initial treatment you received from the

1  hospital, did you have any other follow-up medical appointments

2  with regards to this incident?

3  A.   No.  I didn't go back for no follow up.

4       They just told me if I had any dental issues to go to the

5  dentist and everything, but I was good to go.  I didn't have

6  any dental issues.

7            MR. HINKLEY:  Very good.  No further questions.

8  Thank you, sir.

9                      CROSS EXAMINATION

10 BY MS. CRONIN:

11 Q.   Officer, did you at any time have records that you

12 reported any psychological issues?

13            THE COURT:  What?

14 BY MS. CRONIN:

15 Q.   Officer, did you have any records to show that you did

16 report any psychological problems to your employer?

17 A.   No.

18 Q.   Do you have any medical records from the time that you

19 went to the hospital?

20 A.   I do have, like, an injury assessment from the hospital

21 that I used to submit to worker's comp.

22 Q.   Do you have that with you?

23 A.   No, I don't have it with me, ma'am.

24 Q.   Did you ever give that to the Government?

25 A.   Yes.

1    When I say the Government, I gave it to my employer.

2  Q.    Let me ask you, was the assessment that was done at the

3  prison thorough?

4  A.    Well, they do an assessment as best as possible, and they

5  tell me if I'm good with that, I can go home, or I can go to

6  the hospital, and I wanted to go to the hospital to be looked

7  at, because they didn't have the X-ray capability and stuff to

8  be checked out properly.

9  Q.    So they weren't doing X-rays, but did they do an accurate

10 assessment of your injuries?

11 A.    To the best of my knowledge, they did a fairly accurate

12 assessment.

13 Q.    What does fairly mean?

14    Did they do an accurate -- did they do an accurate

15 assessment of you injuries?

16 A.    They asked me if I wanted to have more assessment there,

17 or I could go to an outside hospital.  I chose to go to an

18 outside hospital.

19 Q.    Did they record your injuries accurately?

20 A.    I know there was an injury assessment done at the

21 institution.  I did not actually see it to know how accurate it

22 was, but I went to a hospital outside.

23 Q.    Let me show you what I have attached to my sentencing

24 memo.  There is no mention here of any cut in your nose, nor is

25 there any evidence of a laceration in your top lip.

1        What it says is, contusion to upper and lower lips.  Small

2    laceration, interior lower lip.  Small laceration, left elbow.

3        Now, that was not caused by the punch by Mr. Tensley, was

4    it, the left elbow laceration?

5    A.    No.  Not the actual punch, no.

6    Q.    And, in fact, that would be a superficial injury.

7        Nothing was done at the hospital for that either, right?

8    A.    Besides X-rays, nothing was done.

9    Q.    But there was nothing wrong.

10        The X-rays showed nothing, correct?

11   A.    The X-rays showed no broken bones, ma'am.

12   Q.    There was no treatment for your elbow at the hospital?

13   A.    No.

14   Q.    Is it fair to say that there was no treatment for your

15   inner lower lip cut either?

16   A.    No, there was no treatment, ma'am.

17   Q.    In fact, there was no treatment at the hospital, other

18   than X-rays and an evaluation that there was no damage done?

19   A.    That's fair.

20   Q.    You were told if the headaches got severe, you should go

21   back to the hospital, is that correct?

22   A.    Yes.

23   Q.    Did you go back?

24   A.    No

25            MS. CRONIN:  No further questions, Your Honor.

1    MR. HINKLEY:  Nothing further.

2    Thank you, sir.

3    THE COURT:  Thank you very much.

4    Anything else?

5    MR. HINKLEY:  I have no further evidence with regards

6  to that objection.

7    MS. CRONIN:  We maintain our objection to that, but

8  no more evidence.  No evidence.

9    THE COURT:  What is your objection?

10    MS. CRONIN:  My objection, Your Honor, and not for a

11  moment does my objection try to minimize the danger that the

12  officer has in his job and the fact that he was hit.  We're not

13  trying to negate that.

14    The injuries simply don't rise to the level that

15  gives the enhancement, and we have laid that out rather clearly

16  in our sentencing memo.

17    It is; one, the injury to this officer was very like

18  that to Officer Mejia-Canales, who was a 2006 Tenth Circuit

19  case in which it's a prison guard who suffered a cut, just as

20  Officer Siedel did being punched in the face and his teeth

21  actually cut and bruised his lips.  It's an incredibly similar

22  case.

23    The Judges in the Third Circuit said -- excuse me --

24  the District Court found that that was enough to be bodily

25  injury with the definition of the sentencing guidelines.

1        The only difference in this case is that the officer

2   took the stand and said he got treatment -- not treatment, but

3   examined, and they found no damage, no damage any more severe

4   than happened to this person.  There is no requirement -- than

5   happened to Officer Mejia-Canales.

6        Three years later, this officer is talking about some

7   psychological damage, but he didn't miss any work.

8        For all of those reasons, we would ask the Court to

9   realize that there is definite -- harm was done to this

10  officer, and that is why there is the three levels for physical

11  contact added on.  There's the enhancement for physical

12  contact, which is three levels in the presentence report.

13       What should not be added on, and our position, is the

14  two levels for bodily injury.

15       THE COURT:  Thank you.

16       Mr. Hinkley.

17       MR. HINKLEY:  Thank you, Your Honor.

18       As I read the case presented, which is a Tenth

19  Circuit case, which obviously is not controlling, but certainly

20  instructive to the Court here, in that case, the Government

21  presented only photographs, and not very good photographs,

22  according to what the Tenth Circuit indicates with regards to

23  what injuries that particular victim had.

24       What the finding of the Tenth Circuit was is, based

25  on that evidence and that evidence alone, it wasn't sufficient

1  to show that the injury was either painful or lasting, which

2  was required by the Tenth Circuit to show that this particular

3  enhancement would be applicable.

4          I would suggest in this case we have the benefit of

5  Mr. Siedel's testimony, which indicates that it was painful,

6  that he did seek medical attention, and that there were some

7  lasting effects, at least three days of headaches based on what

8  the victim indicated here.

9          I would suggest to the Court that that evidence is

10  more sufficient for a finding of the two-level enhancement

11  under the guidelines.

12          THE COURT:  Reviewing the testimony of Mr. Siedel and

13  reviewing the photographs and the circumstances surrounding

14  this, we will overrule the objection.  It stands.  The

15  objection is denied.

16          We will now proceed to sentence.

17          MR. HINKLEY:  With that being the case, Your Honor,

18  the sentencing guideline range in this particular matter is --

19          THE COURT:  33 to 41.

20          MR. HINKLEY:  Yes, I believe that is correct, Your

21  Honor.

22          So, perhaps, the Court wants to hear argument.

23          THE COURT:  Do you have anything?

24          MR. HINKLEY:  I mean, I could make argument with

25  regard to what I think is an appropriate sentence, but usually

1  the Court asks the Defendant and counsel first.

2          THE COURT:  No, not necessarily.

3          MR. HINKLEY:  If you ask me, Your Honor, the

4  Government would suggest to the Court that a sentence within

5  the guidelines would be appropriate here, based on all the

6  facts and circumstances that are in the presentence

7  investigative report, as well as the testimony of the victim

8  here today.

9          It is a significant sentence.  I think it is

10  appropriate, and within the guideline range is what we are

11  recommending the Court do.

12          THE COURT:  Okay.

13          Ms. Cronin.

14          MS. CRONIN:  Your Honor, as the Court is well aware,

15  this sentence can be consecutive or it can be concurrent to

16  what my client is serving now.

17          Should it be consecutive, he will not begin to serve

18  one day of the sentence that you impose until he's 50 years

19  old.

20          He's had a lot of arrests.  Violence is really not

21  something that has been a big part of his life.  There's been

22  drugs and driving without a license.

23          As you know from the presentence report and from our

24  sentencing memorandum, my client's start in life was rough.  He

25  had two parents who both had huge issues of their own and were

1   unavailable to him.

2          He's not using that as an excuse for how things

3   turned out, but what he's realized now is, after a long

4   incarceration -- he's had two years without incidents -- he is

5   making an effort to get a hold on his fragile psychological

6   situation.  He has more meaningful contact with his daughter

7   than he's had in years.  He is getting older.

8          We ask the Court to consider a sentence of 24 months

9   as adequate to punish him, to let everybody know that one punch

10  to an officer, even when you're in a food line -- and he had

11  no -- most of the people that I have who punched have had

12  contraband.  They've hidden something.  He had nothing.  He

13  wasn't drunk.  He had no contraband.  He had no shank.  He had

14  no food.

15         He felt he had been touched inappropriately and

16  reacted in a way that he's going to not be able to react in the

17  future, but that is why he did this, not to hide any

18  wrongdoing, not for any vengeance on this particular officer,

19  who I don't believe he knows that well.

20         Given all the circumstances, Your Honor, I would ask

21  the Court to seriously consider a sentence lower than the

22  guidelines.

23         THE COURT:  Thank you.

24         Mr. Tensley, do you want to say anything?

25         MR. TENSLEY:  On 8/14/13, I don't recall what this

1 officer saying I had done to him, but I recall being beaten by

2 officers in retaliation of this situation, being placed in the

3 SHU for 15 months, and lost contact with family and friends.  I

4 got handcuff marks around my wrists, chain marks around my

5 ribs.  So I feel like I have been punished enough, because it's

6 not just -- because I think I have been put through enough.

7         They have retaliated on me in multiple ways.  I lost

8 the things I was eligible for in my sentence I'm serving now.

9 I'm no longer eligible because of this charge.

10         I have suffered.  I believe I have suffered enough

11 with this whole situation that I just want it behind me, but I

12 have talked to certain people and found out through my lawyer

13 that the officer didn't even go to the hospital, you know,

14 because I asked for this, this motion, so I could see what type

15 of injuries the officer had.

16         I would like to apologize to this officer, but that

17 morning, he was coming up my leg, and he went between my

18 buttocks, and I flinched, and from that flinch, all this

19 happened, but when my head hit that wall, I blacked out, so I

20 don't recall hitting the officer, but they say I hit him.  My

21 lawyer said I hit him.  I haven't seen anything other than the

22 pictures they took of him.

23         But then when you look at the pictures they took of

24 me, they're saying my wounds were old wounds.  My wounds was

25 fresh wounds.  The officer hit me in my eye, pushed my head

1  into the wall.  I was tackled down.  I got scars on my legs.

2          So I apologize.  It was just that I was going through

3  some things; medication, family, and I just felt like he

4  touched me improperly.  Thank you.

5          THE COURT:  Thank you.

6          Mr. Tensley, in passing sentence on you, I have taken

7  into consideration the presentence investigation report, the

8  seriousness of the offense, the sentencing memorandum that was

9  filed by Ms. Cronin, your statements and Ms. Cronin's

10 statements, the testimony of Mr. Tensley -- I'm sorry -- of

11 Mr. Siedel and the statements by Mr. Hinkley.

12         The sentence that is imposed, I believe, satisfies

13 the purposes of our Sentencing Act, Section 3553(a), which

14 includes the necessity of deterrence, just punishment, the

15 promotion of respect for the law, protection of the public,

16 assurance of correctional treatment for the Defendant.

17         It reflects full consideration of all the factors,

18 including the nature and the seriousness of the offense, and

19 the history and the characteristics of the Defendant, the types

20 of sentences that are available, the advisory sentencing

21 ranges, and the policies prescribed by our sentencing

22 commission, and we find that the sentence that I will impose is

23 reasonable in light of all of these considerations.

24         This matter here, on August 14th of 2013, at 6:37

25 a.m., Officer Siedel attempted to conduct a random pat-down

1  search of an inmate while Mr. Tensley was leaving the food

2  area, the service area.

3          Siedel attempted to search the Defendant's upper

4  right leg.  Tensley swung around and knocked the officer's hand

5  away.  Siedel immediately attempted to place the Defendant

6  against the wall to apply hand restraints.

7          Tensley became aggressive, and with a closed fist,

8  punched the officer in the face.

9          Tensley was subsequently restrained by assisting

10 officers.

11         Siedel was medically assessed and treated for

12 contusions to his upper lip and lower lip and a smaller

13 laceration on his elbow and contusion to the base of his left

14 finger.

15         Then he subsequently was examined at the regional

16 hospital in that area.  This all happened at FCI Schuylkill.

17         Mr. Tensley is 38 years old.  He was born and raised

18 around Clearwater, Florida, and raised by his mother.  His

19 father reportedly abused alcohol and the mother sold illicit

20 drugs.

21         Mr. Tensley reports good physical health.  He is

22 prescribed medication for a mood disorder.  He smoked marijuana

23 prior to being in custody and has participated in substance

24 abuse treatment while in prison by the Bureau of Prisons.

25         He has earned a general equivalent diploma in 2009

1  while he was incarcerated, and he has been in continuous

2  Federal custody since June 11th, 2003.

3          He has an extensive criminal record which began at

4  the age of 10, and his offenses include theft, assault and

5  battery, drug possession and delivery, and a number of traffic

6  violations, and failure to appear and resisting arrest.

7          He has a number of prior convictions; 23 misdemeanors

8  and 15 felonies.  Three of the 15 felonies are of an assaultive

9  nature.  The others include a number of drug convictions.

10          We have a large number of Federal corrections

11  institutions in the Middle District of Pennsylvania.  We may

12  have one of the largest number of corrections institutions in

13  the United States, and it is a serious offense.

14          Mr. Tensley comes before the Court, and he has a

15  terrible -- you have a terrible record.  These are

16  circumstances which we just cannot take any chances on.  We

17  have to protect all of these people who are serving us in these

18  correctional institutions, and one of them was Mr. Siedel.

19          So I have taken into consideration all of these

20  circumstances; defense counsel's objection to the nature of the

21  assault and the testimony of the victim -- and it could have

22  been much worse -- and I have also taken into consideration all

23  of these people who are on the front line and who are dealing

24  in very difficult circumstances, all of these corrections

25  officers.

1    So, for all of these reasons, now, to wit, this 15th

2  day of June, 2016, pursuant to the Sentencing Reform Act of

3  1984, it is the judgment of the Court that the Defendant, Mr.

4  Tensley, is hereby committed to the custody of the Bureau of

5  Prisons to be imprisoned for a term of 33 months.

6    Now, Mr. Tensley, your exposure when you come before

7  the Court on this charge is 33 to 41 months.  I have taken into

8  consideration all of the circumstances that I have outlined,

9  and I am sentencing you on the lowest level of the guidelines,

10  just so you know that.

11    MR. TENSLEY:  Thank you.

12    THE COURT:  The term of imprisonment imposed by this

13  judgment shall run consecutive to the term of imprisonment

14  imposed by Criminal No. 277-T-23TBM in the U.S. District Court

15  for the Middle District of Florida.

16    We find that the Defendant does not have the ability

17  to pay a fine.

18    The Defendant shall pay to the Clerk of the United

19  States District Court a special assessment of $100 due

20  immediately.

21    Upon release from imprisonment, he shall be placed on

22  supervised release for a term of 3 years.  This term of

23  supervised release shall run concurrently.  There is no

24  additional term of supervised release.  It shall be run

25  concurrently with the terms ordered by 277-T-23TBM.

1          Within 72 hours of release from custody the Bureau

2  of Prisons, the Defendant shall report in person to the

3  probation office in the district to which he is released.

4          While on supervised release, he shall not commit

5  another Federal, state or local crime, and shall not possess a

6  dangerous weapon.  He shall comply with the standard conditions

7  adopted by our Court, and the following additional conditions:

8          One, he shall cooperate in the collection of a DNA

9  sample.

10          Two, he shall submit to one drug test within 15 days

11  of commencing supervision, and at least two periodic drug tests

12  thereafter for the use of a controlled substance.

13          Three, he shall undergo a mental health evaluation.

14  If recommended, he shall satisfactorily complete a program of

15  outpatient or inpatient mental health treatment, and the

16  Defendant shall have no contact with the victim.

17          Darian, you can appeal your conviction if you believe

18  that your guilty plea was somehow unlawful or involuntary, or

19  if there is some other fundamental defect in the proceedings

20  that was not waived by your guilty plea.

21          You also have a statutory right to appeal your

22  sentence under certain circumstances, particularly if you think

23  the sentence is contrary to law.

24          With few exceptions, any notice of appeal must be

25  filed by you within 14 days of today, the day of your sentence.

1    If you are unable to pay the costs of an appeal, you

2 can apply for leave to appeal in forma pauperis.  If you so

3 request, the Clerk of Court will prepare and file a notice of

4 appeal on your behalf.

5    Darian, you made a very bad choice.  Counsel has

6 brought out the circumstances under which you took a swing at

7 the officer, but we just -- in addition to everything else, we

8 just can't take a chance on that.  These people are on the

9 front line of corrections.

10    Good luck to you, Mr. Tensley.

11    MR. HINKLEY:  Thank you.

12    MS. CRONIN:  Your Honor, could the Court recommend

13 that the Bureau of Prisons consider a facility in Florida so

14 that he can at some point --

15    THE COURT:  Where is he serving now?

16    Oh, he's up here.

17    MS. CRONIN:  Up here.

18    He has been removed from his family for a long time.

19    When the time comes, if they could consider Florida.

20 That's where he's going to be living when he's out.

21    THE COURT:  I strongly recommend that he serve the

22 remainder of his sentence commencing immediately in Florida.

23    Good luck to you, Darian.

24    (At this time, the proceedings in the above-captioned

25 matter adjourned.)

1

## REPORTER'S CERTIFICATE


    I, Suzanne A. Halko, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings had in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further   certify that the foregoing transcript has been prepared by me or under my supervision.


                _____
                Suzanne A. Halko, RMR, CRR
                Official Court Reporter


REPORTED BY:

SUZANNE A. HALKO, RMR, CRR
    Official Court Reporter
    United States District Court
    Middle District of Pennsylvania
    Scranton, PA  18501-0090


    (The foregoing certificate of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)